2014 IL App (1st) 122610

FIFTH DIVISION
December 31, 2014

No. 1-12-2610

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 02 CR 3413 (03) |
| DEVIN REED, | ) ) | |
| Defendant-Appellant. | ) ) ) | Honorable Dennis J. Porter, Judge Presiding. |

JUSTICE REYES delivered the judgment of the court, with opinion.
Presiding Justice Palmer and Justice Gordon concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a jury trial in the circuit court of Cook County, petitioner Devin Reed was found guilty of first degree murder, armed robbery and residential burglary.  On direct appeal, this court affirmed Reed's conviction for murder and his natural life sentence, but reversed his convictions and sentences for armed robbery and residential burglary.  *People v. Reed*, 405 Ill. App. 3d 279, 286 (2010).  Pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq*. (West 2010)), Reed thereafter initiated the instant postconviction proceeding by filing a *pro se* petition asserting various trial errors, as well as claims that he received ineffective assistance of trial and appellate counsel.  On July 26, 2012, the circuit court entered a memorandum order dismissing Reed's petition as frivolous and patently without merit.  Reed now appeals,

contending his petition stated the gist of claims of ineffective assistance of appellate counsel. Reed also contends his natural life sentence for first degree murder is void. For the following reasons, we affirm.

¶ 2                                    BACKGROUND

¶ 3                                   Reed's Trial

¶ 4      The facts adduced at Reed's trial were fully set forth in this court's opinion on Reed's direct appeal. *Reed*, 405 Ill. App. 3d at 281-84. We briefly summarize those proceedings and note additional facts here to the extent necessary to address the issues raised in this appeal.

¶ 5      On January 1, 2002, after midnight, Reed, Anthony Williams, India Williams, and Kimberly Thompson drove to Timothy Kollar's residence near 25th Street and Kildare Avenue in Chicago, where they all smoked cocaine. When the drugs ran out, Reed, Anthony, and India left to purchase more cocaine, during which time they agreed they would rob Kollar.

¶ 6      At some time after Reed, Anthony, and India returned to Kollar's home, Thompson left the house to place a telephone call. Approximately 20 minutes later, while Kollar and India were smoking cocaine, Reed wrapped a porcelain statue in foam and struck Kollar on the right side of his head with the statue. The blow did not render Kollar unconscious. Anthony then grabbed an aluminum baseball bat and struck Kollar two or three times while Reed searched the bedroom for money. India bound Kollar's legs with an electrical cord, after which she and Anthony both struck Kollar more times with the bat. Reed exited the room but could hear the bat strike Kollar several more times. By the time Thompson returned, Reed, Anthony and India were removing items, including guitars, from Kollar's home. India also took money from Kollar.

¶ 7      Medical examiner Dr. Michelle Jordan testified Kollar died of cranial cerebral injuries due to blunt force trauma, with strangulation a significant contributing factor to Kollar's death.

Dr. Jordan characterized the death as tortuous based on the extent of the injuries, the degree of bondage and a wound to the neck.

¶ 8     Thompson, who testified at trial on behalf of the State, acknowledged that she was a prostitute in January 2002 and admitted that she was a drug addict. Thompson had difficulty identifying Reed as one of the men she was with at Kollar's house. She testified that she had memory problems as a result of her past addictions and because of her bipolar disease. After Thompson learned from the televised newscast that Kollar had been killed, she contacted the police. Thompson subsequently met with police officers and identified Reed, Anthony, and India.

¶ 9     Retired Chicago deputy police chief of narcotics and gangs Michael Cronin testified that after Reed was identified in a lineup, he informed Reed of his *Miranda* rights and Reed recounted the events surrounding the incident. A few hours later, Cronin and Assistant State's Attorney (ASA) Erica Dillon had another conversation with Reed. ASA Dillon testified she also informed Reed of his *Miranda* rights, whereupon Reed waived those rights and again discussed the circumstances of the incident. ASA Dillon further testified she informed Reed of various ways he could memorialize his statement, but Reed preferred to provide only an oral statement. ASA Dillon additionally testified she then dictated what Reed told her to her supervisor, who was not present for Reed's oral statement. According to ASA Dillon, she reviewed her supervisor's transcription, but she acknowledged Reed did not have the opportunity to review the transcription.

¶ 10    During the conference regarding jury instructions, Reed's counsel objected to the verdict forms and requested that the jury be given separate verdict forms for felony murder and intentional or knowing murder. The court denied the defense counsel's request.

¶ 11    The jury returned guilty verdicts for first degree murder, armed robbery and residential burglary.  The jury also found that the armed robbery was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

¶ 12    On October 24, 2008, defense counsel filed a posttrial motion for a new trial.  On October 31, 2008, Reed also filed two *pro se* posttrial motions, one seeking a new trial and one seeking new counsel.

¶ 13    In his *pro se* supplemental motion for a new trial, Reed argued he had received ineffective assistance of trial counsel because counsel had failed to file a pretrial motion to suppress Reed's statement to the police.  Reed asserted the transcription of his "alleged" statement raised questions regarding its validity.  Reed noted Cronin's testimony that ASA Dillon transcribed the statement conflicted with ASA Dillon's testimony that she related the statement to her superior.  Reed also contended his trial counsel interfered with his right to testify on his own behalf.  Reed asserted he would have testified: he told an ASA named Chung he did not wish to give a statement; he never gave the police a statement; and the police never informed him of his *Miranda* rights.  Reed further contended his trial counsel failed to present other defense witnesses, including ASA Dillon and ASA Chung.

¶ 14    Reed's *pro se* supplemental motion additionally asserted that trial counsel failed to subpoena any records of complaints against Cronin.  Moreover, Reed complained that trial counsel failed to object to or strike several of the jurors.  Trial counsel was also allegedly ineffective in the impeachment of Thompson.  Reed's *pro se* supplemental motion further claimed the trial court erred in allowing death photographs of the victim to be shown to the jury, allowing the in-court identification of Reed by Thompson, and overruling objections to allegedly inadmissible evidence.  In addition, Reed's supplemental motion contained general allegations

that the State failed to prove Reed guilty beyond a reasonable doubt and was contrary to the evidence in the record.

¶ 15    In his other *pro se* posttrial motion, Reed argued his allegations of ineffective assistance of counsel created a conflict of interest requiring the appointment of new counsel.  Reed asserted his trial counsel otherwise would be unable to testify regarding Reed's claims at a hearing on Reed's *pro se* supplemental motion for a new trial.

¶ 16    The trial court denied Reed's posttrial motions.  After reviewing Reed's allegations of ineffective assistance of trial counsel, the trial court stated it did not "see that the motion would be granted in any event," and observed Reed had presented nothing but the allegation that ASA Chung would have testified as alleged by Reed.  The trial court further observed there was nothing in the proceedings establishing either of Reed's trial counsels' performance was "so deficient that [it] would entitle [Reed] to a new counsel."

¶ 17    Reed then waived a jury for sentencing purposes. The trial court found that Reed was eligible for the death penalty.  In particular, the trial court found: the murder occurred during the course of a felony; the acts causing Kollar's death were inflicted at least in part by Reed; and Reed acted with the knowledge his acts created a strong probability of death or great bodily harm to Kollar.  After hearing arguments in aggravation and mitigation of the offense, the trial court initially observed the victim's death "was brutal and heinous beyond the most person's [*sic*] capacity to understand probably or even imagine," noting the victim's "horrible death" would "in many cases" "qualify someone to receive the ultimate penalty."  The trial judge also observed Reed had a dozen convictions related to automobile theft, which suggested Reed was unlikely to "change his ways."  The trial judge noted in mitigation of the offense that Reed's family background was "quite horrible."  In addition, Reed had obtained a G.E.D., was arguably not

present at the killing, and had no convictions for violent crimes. The trial judge also considered Reed's statement that he had wrapped the statue in foam before striking the victim, which arguably suggested some concern for the damage to be caused to the victim by the blow. The trial court ultimately sentenced defendant to natural life imprisonment for felony murder, a concurrent extended-term sentence of 60 years for armed robbery, and a concurrent 15-year sentence for residential burglary. *Id*. at 285.

¶ 18    On November 7, 2008, Reed filed a *pro se* motion to reduce his sentence, which the trial court denied. The record indicates Reed's trial counsel also filed a motion to reduce sentence on November 14, 2008. The transcript of proceedings indicates that the trial judge noted Reed's eligibility for the death penalty in denying Reed's postsentencing motions.

¶ 19                    The Direct Appeal

¶ 20    In his direct appeal to this court, Reed raised the following issues: (1) whether the trial court erred by denying his request to provide the jury with separate instructions and verdict forms for felony murder, which resulted in him receiving an improper sentence on the predicate felonies; (2) whether the trial court erred when it imposed extended-term sentences for both first degree murder and armed robbery as extended-term sentences may only be imposed on the conviction of the most serious offense; (3) whether the evidence was insufficient to prove him guilty beyond a reasonable doubt of residential burglary where he was invited into the victim's home; (4) whether the trial court abused its discretion in sentencing him to natural life imprisonment for first degree murder because this was his first conviction for a violent offense and he had minimal involvement in the events that resulted in the victim's death; and (5) whether the trial court erred in refusing to allow defense counsel's proposed addict instruction where it was an accurate statement of the law and one of the State's witnesses was an admitted drug

addict. *Id*.

¶ 21    This court, following our supreme court's decision in *People v. Smith*, 233 Ill. 2d 1 (2009), concluded the trial court should have granted Reed's request for separate verdict forms for intentional, knowing, and felony murder. Accordingly, the appellate court affirmed Reed's conviction for murder, but reversed his convictions and sentences for residential burglary and armed robbery. *Reed*, 405 Ill. App. 3d at 286. The disposition of that issue rendered it unnecessary for the appellate court to consider the sufficiency of the residential burglary conviction and the propriety of the sentence on the armed robbery conviction. *Id*.

¶ 22    This court also ruled the trial court properly sentenced Reed to natural life imprisonment for felony murder, noting the trial court found Reed eligible for the death penalty based on the fact that during the course of another forcible felony, Reed inflicted injuries which at least in part contributed to Kollar's death, and acted with the knowledge that his acts created a strong probability of death or great bodily harm. *Id*. at 287 (citing 720 ILCS 5/9-1(b)(6) (West 2006)). Lastly, this court ruled the trial court did not err in refusing to allow defense counsel's proposed addict instruction. *Reed*, 405 Ill. App. 3d at 288.

¶ 23    Our supreme court denied Reed's petitions for leave to appeal. *People v. Reed*, Nos. 1-11-1654, 1-11-1678 (Mar. 30, 2011). The United States Supreme Court denied Reed's petition for *certiorari* review. *Reed v. Illinois*, No. 11-5906 (U.S. Oct. 17, 2011).

¶ 24                         Postconviction Proceedings

¶ 25    Reed subsequently filed his *pro se* petition for postconviction relief.[1] Reed divided his

_____

[1] The record on appeal contains a notice of filing with a notarized statement that Reed mailed his petition from prison on April 12, 2012. The petition itself is time-stamped as filed on both April 26 and May 3, 2012.

petition into three sections: (1) ineffective assistance of trial counsel; (2) trial errors; and (3) ineffective assistance of appellate counsel.

¶ 26    Reed primarily claimed his trial counsel was ineffective by failing to file a pretrial motion to suppress his "alleged" oral statement. Reed asserted he would have denied giving any oral statement and told ASA Chung he did not wish to make a statement. Reed also denied that he was ever informed of his *Miranda* rights and did not sign a waiver of those rights. Reed further asserted he would have testified that he denied participating in the crime and had no knowledge of the incident until he was arrested. Reed maintained that if trial counsel had pursued a motion to suppress, the outcome of his trial would have been different because neither Thompson nor Harris testified that Reed murdered or robbed Kollar, and because Cronan and ASA Dillon would not have been allowed to testify regarding his alleged inculpatory statements. Reed's petition also faulted trial counsel's performance on additional grounds, including—but not limited to—his failure to argue his motion for a directed finding, conduct discovery regarding possible complaints of misconduct by Cronin, investigate and interview all witnesses, sufficiently cross-examine Thompson, and call a clinical psychologist to testify that Thompson was easily led and would repeat stories.

¶ 27    Reed's petition next asserted the trial court erred by allowing the State to deprive Reed of exculpatory evidence regarding his alleged oral statement, in violation of *Brady v. Maryland,* 373 U.S. 83 (1963). Reed also alleged the trial court erred by allowing the State to lead Thompson in her testimony and in her in-court identification of Reed, thereby resulting in a false identification. Reed additionally alleged the prosecutor deprived him of due process of law by engaging in this misconduct.

¶ 28    Reed's petition further alleged he received ineffective assistance of appellate counsel

where counsel failed to: (1) include the charging instruments in his direct appeal; (2) telephone Reed to discuss the appeal; (3) challenge the admissibility of his alleged oral statement as hearsay, with no proof Reed actually provided it; (4) "to renew Post Trial Motion's [*sic*], motion for New Trial, motion for appointment of new counsel"; (5) raise discovery violations related to ASA Dillon's supervisor; and (6) claim prosecutorial misconduct related to the prosecutor's leading Thompson into a false identification of Reed.

¶ 29    Reed's petition was supported by five excerpts from the transcript of proceedings at his trial.  Exhibit A includes ASA Dillon's testimony regarding the transcription of Reed's oral statement.  Exhibit B includes Cronin's testimony regarding the transcription of Reed's oral statement, which allegedly contradicted ASA Dillon's testimony.  Exhibit C includes the transcript indicating that defense counsel declined to present oral argument on the motion for a directed finding.  Exhibit D included a statement by defense counsel that certain discovery regarding Thompson's criminal background had not been tendered by the State, along with the later admission that the material had been tendered and that counsel did not bother checking because it was a big file.  Exhibit E included Thompson's in-court identification of Reed.

¶ 30    Reed also attached several letters from the office of the State Appellate Defender (OSAD), two of which relate to the issues raised in this appeal.  A May 21, 2010, letter suggests Reed had informed appellate counsel that he was disappointed with the arguments presented in his direct appeal.  The May 21 letter states that counsel reviewed Reed's *pro se* motion for a new trial, and researched issues related to the trial counsel's failure to file a motion to suppress.  The letter observed that witnesses testified at trial regarding Reed's statement and suggested that if Reed had evidence that he did not make a statement, it would be an issue to consider raising in a postconviction petition.

¶ 31    A September 8, 2010, letter from OSAD suggests Reed had concerns about the issues raised in his brief on direct appeal. Although Reed apparently suggested arguing the State misled the jury regarding Thompson's identification of Reed, counsel responded that the jury heard Thompson's testimony and had the opportunity to consider its weaknesses. The September 8 letter also stated there was no confrontation clause issue with respect to his oral statement, because ASA Dillon had testified and her supervisor was not required to appear as a witness because it was an oral statement and the related notes were not introduced into evidence.

¶ 32    On July 2, 2012, the circuit court entered a memorandum order which addressed Reed's claims and dismissed Reed's postconviction petition as frivolous and patently without merit. On July 26, 2012, Reed filed a timely notice of appeal to this court.

¶ 33                            ANALYSIS

¶ 34    On appeal, Reed argues the circuit court erred in summarily dismissing his postconviction petition, which Reed contends stated the gist of claims of ineffective assistance of appellate counsel. Reed also contends his natural life sentence for first degree murder is void. We address these contentions in turn.

¶ 35                The Dismissal of the Postconviction Petition

¶ 36    Reed filed his *pro se* petition pursuant to the Post-Conviction Hearing Act (Act), which provides a method for a criminal defendant to assert that his or her conviction was the result of "a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122-1(a)(1) (West 2010); see *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). A postconviction proceeding is a collateral attack on the prior conviction or sentence that does not relitigate a defendant's innocence or guilt. *People v. Ligon*, 239 Ill. 2d 94, 103 (2010). A petitioner commences proceedings under the Act by filing a petition in the circuit

court in which the original proceeding occurred. *Hodges*, 234 Ill. 2d at 9. The Act provides for three stages of proceedings in cases not involving the death penalty. *Id*. at 10. At the first stage, a postconviction petition may be summarily dismissed within 90 days of its filing if "the court determines the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2010). A petition is frivolous or patently without merit if it "has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 12. Our supreme court has explained:

"A petition which lacks an arguable basis either in law or in fact is one which is based on an indisputably meritless legal theory or a fanciful factual allegation. An example of an indisputably meritless legal theory is one which is completely contradicted by the record. [Citation.] Fanciful factual allegations include those which are fantastic or delusional." *Id*. at 16-17.

If the petition progresses to the second stage, counsel may be appointed for an indigent defendant, and the State may answer or move to dismiss. 725 ILCS 5/122-4, 122-5 (West 2010). If the defendant makes a "substantial showing" of a constitutional violation at the second stage, then the petition proceeds to a third-stage evidentiary hearing. 725 ILCS 5/122-6 (West 2010).

¶ 37    In this case, the circuit court dismissed Reed's petition at the first stage. We review *de novo* the dismissal of a postconviction petition without an evidentiary hearing. *Hodges*, 234 Ill. 2d at 9.

¶ 38    Whether a petitioner's claims survive the first stage of the postconviction proceedings is dependent upon whether the petition conforms to the requirements of the Act. *People v. Brown*, 2014 IL App (1st) 122549, ¶ 46. To survive dismissal at the first stage, a petition need only present the gist of a constitutional claim. See *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). When our supreme court has spoken of a "gist," however, it has meant "only that the section 122-

2 pleading requirements are met, even if the petition lacks formal legal arguments or citations to legal authority." *Hodges*, 234 Ill. 2d at 9.

¶ 39    Section 122-2 of the Act requires that a postconviction petition must "clearly set forth the respects in which petitioner's constitutional rights were violated." 725 ILCS 5/122-2 (West 2010). A petitioner must " 'set forth the specific manner in which his rights were violated.' " *People v. Delton*, 227 Ill. 2d 247, 254 (2008)(quoting *People v. Porter*, 122 Ill. 2d 64, 73 (1988)). Only a "gist" of a constitutional claim is needed at this first stage. See *Hodges*, 234 Ill. 2d at 9. "With regard to this requirement, a defendant at the first stage need only present a limited amount of detail in the petition." *Id*. The allegations in the petition must be taken as true and liberally construed. *Edwards*, 197 Ill. 2d at 244. Nevertheless, "nonfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require a hearing under the Act." *People v. Rissley*, 206 Ill. 2d 403, 412 (2003) (citing *People v. Coleman*, 183 Ill. 2d 366, 381 (1998)).

¶ 40    Section 122-2 of the Act also requires that the petitioner either provide "affidavits, records, or other evidence" to support the petitioner's allegations or explain the absence of such documentation. 725 ILCS 5/122-2 (West 2010). "The purpose of the 'affidavits, records, or other evidence' requirement is to establish that a petition's allegations are capable of objective or independent corroboration." *Hodges*, 234 Ill. 2d at 10 (citing *Delton*, 227 Ill. 2d at 254). At the first stage of review, if the affidavits do not comply with the evidentiary requirements of section 122-2, then the petition must comply with the pleading requirements of section 122-2 by at least providing an explanation as to why the documents or affidavits are not attached. See *People v. Collins*, 202 Ill. 2d 59, 66-67 (2002). The failure to either attach the appropriate supporting material or explain its absence justifies the summary dismissal of a petition. *Delton*, 227 Ill. 2d

at 255.[2]

¶ 41    On appeal, Reed argues he has stated the gist of claims that he received ineffective assistance of appellate counsel.  Reed first contends his appellate counsel was ineffective in failing to argue the prosecutors and police failed to honor Reed's requests to remain silent and for counsel, and interrogated him in violation of his fifth amendment rights.  Reed also contends his appellate counsel was ineffective for arguing that, pursuant to *Smith* and *People v. Bailey*, 2013 IL 113690, the treatment of his general guilty verdict as a verdict of felony murder made him legally ineligible for a natural life sentence.

¶ 42                                    Forfeiture

¶ 43    The State initially responds that Reed's petition not only fails to state the gist of these claims, but also fails to raise them at all, resulting in forfeiture of these claims on appeal.  See 725 ILCS 5/122-3 (West 2010) ("Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived."); *People v. Pendleton*, 223 Ill. 2d 458, 475 (2006) (reiterating that a claim not raised in a postconviction petition cannot be raised for the first time on appeal).  This court lacks the authority to excuse an appellate forfeiture caused by the failure of a litigant to include issues in his or her postconviction petition.  See *People v. Jones*, 213 Ill. 2d 498, 507-08 (2004).  Our supreme court has criticized this court more than once for inappropriately overlooking the waiver provision of the Act and addressing " 'claims

---

[2] We note the failure to attach supporting materials pursuant to section 122-2 of the Act differs from the failure to attach a verification affidavit pursuant to section 122-1(b) of the Act, which our supreme court has held is not fatal at the first stage of postconviction proceedings. See *People v. Hommerson*, 2014 IL 115638, ¶ 14 n.1 ("The petition did contain several affidavits pursuant to section 122-2 [citation] of the Act, which are not at issue here.").

raised for the first time on appeal for various and sundry reasons.' " *Pendleton*, 223 Ill. 2d at 475

(quoting *Jones*, 213 Ill. 2d at 506). As our supreme court noted in *Jones*, attempts by counsel to

raise claims for the first time on appeal from the first-stage dismissal of a postconviction petition

are understandable, but simply not permitted under the Act:

> "[T]he typical *pro se* litigant will draft an inartful pleading which does not survive
>
> scrutiny under the 'frivolity/patently without merit' standard of section 122-2.1,
>
> and it is only during the appellate process, when the discerning eyes of an
>
> attorney are reviewing the record, that the more complex errors that a nonattorney
>
> cannot glean are discovered. The appellate attorney, not wishing to be remiss in
>
> his or her duty, then adds the newly discovered error to the appeal despite the fact
>
> that the claim was never considered by the trial court in the course of its ruling.
>
> *** [T]he attorney is zealously guarding the client's rights and is attempting to
>
> conserve judicial resources by raising the claim expeditiously at the first available
>
> chance. These goals are laudable, but they nonetheless conflict with the nature of
>
> appellate review and the strictures of the Act." *Jones*, 213 Ill. 2d at 504-05.

In *Jones*, the defendant's *pro se* petition for postconviction relief employed a preprinted form, on

which the defendant asserted only that he was denied his right to effective assistance of counsel

under the sixth and fourteenth amendments of the United States Constitution. *Id*. at 501-02.

Following the summary dismissal of his petition, Jones appealed, arguing for the first time that

the circuit court erroneously admonished him regarding his appeal rights pursuant to Illinois

Supreme Court Rule 605 (eff. July 1, 1975). *Id*. at 502. The appellate court affirmed the circuit

court's summary dismissal, holding that the petition failed to establish the gist of a constitutional

claim. *Id*. Our supreme court affirmed, holding that Jones could not raise the issue of improper

admonishments for the first time on appeal. *Id*. at 509; see also *People v. Blair*, 215 Ill. 2d 427, 445 (2005)(where forfeiture precludes a defendant from obtaining relief, such a claim is necessarily "frivolous" or "patently without merit").

¶ 44　Subsequent to our supreme court's decision in *Jones*, this court has addressed forfeiture during collateral review in *People v. Mars*, 2012 IL App (2d) 110695, *People v. Cole*, 2012 IL App (1st) 102499, *People v. Hemingway*, 2014 IL App (4th) 121039, and *People v. Thomas*, 2014 IL App (2d) 121001. A brief summary of each case is useful to an analysis of the forfeiture issue in this case.

¶ 45　In *Mars*, a grand jury indicted Mars in 2005 on one count of murder, and in 2007 on two additional counts of murder. *Mars*, 2012 IL App (2d) 110695, ¶ 3. Mars moved to dismiss the latter two counts of the indictment on the grounds of denial of due process and denial of a speedy trial. *Id*. The trial court granted the motion but later reversed itself when it granted the State's motion to reconsider. *Id*. The jury ultimately acquitted Mars on the first two counts of the indictment, but found him guilty on the third count. *Id*. ¶ 10. The appellate court affirmed the conviction on direct appeal. *Id*.

¶ 46　Mars filed a postconviction petition, asserting in part that " '[d]efense counsel failed to challenge the sufficiency of the grand jury indictment which omitted essential elements of the charges.' " *Mars*, 2012 IL App (2d) 110695, ¶ 31. The petition asserted that " '[b]ut for, [*sic*] counsel's ineffective assistance of counsel's [*sic*] no trier of fact could have found [the defendant] guilty beyond any reasonable doubt of first degree murder.' " *Id*. The circuit court summarily dismissed the petition. *Id*. ¶ 11. On appeal, Mars claimed that appellate counsel was ineffective for failing "on direct appeal to argue that the trial court erred in not dismissing the 2007 indictment, because it was subject to compulsory joinder with the 2005 indictment and violated

[the] defendant's right to a speedy trial." *Id*. ¶ 31.

¶ 47   The *Mars* court found this claim forfeited. *Id*. ¶ 33. The appellate court noted that however low the threshold for surviving a first-stage dismissal, "[l]iberal construction does not mean that we distort reality." *Id*. ¶ 32. Mars' petition alleged that his "defense counsel" was ineffective for not challenging the indictment for lack of essential elements of the crimes charged. *Id*. ¶ 33. Thus, the petition addressed trial counsel's failure to bring the allegedly faulty indictment to the trial court's attention and the consequences of that omission at trial, whereas postconviction appellate counsel explicitly referred to errors of direct appellate counsel. *Id*.

¶ 48   The *Mars* court held that "[n]o matter how liberally we construe the [petition's] allegation, viewing it in context, we cannot conclude that by this allegation defendant actually raised a claim relating to *appellate* counsel's failure on direct appeal to raise the issue of compulsory joinder and violation of his right to a speedy trial." *Id*. Indeed, the *Mars* court noted that subject matter raised in the petition could not have been compulsory joinder and speedy trial in the context of something his trial attorney failed to do, because trial counsel brought a motion to dismiss the 2007 indictment based on compulsory joinder and a violation of Mars' right to a speedy trial. Accordingly, the court could not conclude that the petition raised a claim relating to *appellate* counsel's failure on direct appeal to raise the issue of compulsory joinder and violation of his right to a speedy trial. (Emphasis in original.) *Id*. The *Mars* court further observed the petition at issue was organized and coherent and demonstrated that Mars was aware of legal concepts (including claims that appellate counsel was ineffective) and was able to articulate the relief to which he thought he was entitled. *Id*.

¶ 49   In *Cole*, the postconviction petition alleged: (1) the trial court violated Illinois Supreme Court Rule 431(b) (eff. May 1, 2007) by failing to " 'properly question the venire' " regarding the

principles underlying the trial; and (2) the prosecutor engaged in misconduct during closing argument when he injected his personal belief by characterizing one of the victims as " 'a credible witness,' " both of which Cole alleged violated his right to due process. *Cole*, 2012 IL App (1st) 102499, ¶ 4. The circuit court summarily dismissed the postconviction petition, reasoning the claims could have been raised on direct appeal and were rebutted by the record. *Id.* ¶ 5.

¶ 50 On appeal, Cole claimed for the first time that appellate counsel's failure to raise the issues regarding the questioning of the venire and the prosecutor's comment on direct appeal rendered his assistance constitutionally deficient. *Id.* ¶ 9. The appellate court, relying on our supreme court's decision in *Jones*, observed that " 'implicit' claims in the defendant's postconviction petition may not be raised for the first time on appeal when those postconviction issues were never ruled upon by the [trial] court." *Id.* ¶ 13 (citing *Jones*, 213 Ill. 2d at 504). Thus, because Cole's postconviction petition included no allegations against appellate counsel's performance on direct appeal, Cole was precluded from asserting for the first time on appeal claims of ineffective assistance of appellate counsel never ruled upon by the circuit court. *Id.* ¶ 16. Accordingly, the *Cole* court affirmed the summary dismissal of the defendant's petition. *Id.* ¶ 25.

¶ 51 In *Hemingway*, the defendant, who was serving a 35-year prison term for armed robbery, appealed from the summary dismissal of his petition for postconviction relief, contending his *pro se* petition raised claims that: (1) his trial counsel rendered ineffective assistance in the jury trial by failing to call an alibi witness; and (2) his appellate counsel rendered ineffective assistance on direct appeal by failing to argue that the sentence was excessive. *Hemingway*, 2014 IL App (4th) 121039, ¶ 1. Regarding the second claim, however, the postconviction petition merely asserted

that direct appellate counsel did not brief one argument regarding his conviction or sentence. *Id.* ¶ 30. The *Hemingway* court concluded: "While it is true that all a petition has to do is allege facts and that it need not make legal arguments or cite authorities [citation], the mere fact that appellate counsel was silent about a sentence is not arguably a constitutional claim." *Id.* ¶ 31.

¶ 52    In *Thomas*, the defendant was convicted of murder and unsuccessfully argued in his direct appeal that the trial court erred by excluding the statement " 'I did it,' " which was uttered to detectives by N.H., an incarcerated minor. *Thomas*, 2014 IL App (2d) 121001, ¶ 1. Thomas filed a *pro se* postconviction petition in which he alleged appellate counsel was ineffective for failing to argue trial counsel's ineffectiveness, reiterating that N.H. confessed to the detectives, asserting that N.H. also confessed to a jail chaplain, and arguing that trial counsel should have taken additional steps to ensure that the confession was admitted. *Id.* ¶ 2. The postconviction court summarily dismissed the petition, concluding that appellate counsel was not ineffective for failing to allege trial counsel's ineffectiveness because trial counsel had raised, argued, and preserved for direct appeal the admissibility of N.H.'s statement to the detectives. *Id.* ¶ 3. On appeal, Thomas framed the underlying issue differently, arguing "appellate counsel was ineffective for failing to argue that the *trial court* erred in excluding N.H.'s conversations with the chaplain and for failing to argue that the chaplain's testimony would have corroborated N.H.'s statement to the detectives." (Emphasis in original.) *Id.* The State responded that defendant forfeited these arguments because the postconviction petition focused on N.H.'s statement to the detectives, not to the chaplain, and attributed the error to trial counsel, not the trial court. *Id.* ¶ 4.

¶ 53    The *Thomas* court, while calling the issue a "close one," ruled Thomas had not forfeited his present appellate arguments. *Id.* ¶ 5. The *Thomas* court reasoned:

> "A liberal construction of the *pro se* petition, defendant's affidavit, and the

record shows that the petition alleges that (1) appellate counsel was ineffective for omissions on direct appeal, (2) trial counsel failed to take the proper steps to corroborate N.H.'s statement 'I did it,' (3) Chaplain Fricks would have testified at trial that N.H. confessed, (4) the trial court excluded N.H.'s separate statements to the detectives and to Chaplain Fricks, and (5) N.H.'s statement to the detectives would have been admitted upon proper corroboration. The logical conclusion to be drawn from these allegations is what defendant argues in this appeal: Chaplain Fricks' testimony is the 'other evidence' that should have been admitted to corroborate N.H.'s statement to the detectives." *Id*. ¶ 62.

Accordingly, the court rejected the State's forfeiture argument and ultimately concluded the petition stated the gist of a constitutional claim. *Id*. ¶ 63.

¶ 54    In *Thomas*, the court distinguished *Mars* as follows:

"In *Mars*, the petition faulted trial counsel for omissions related to the sufficiency of the charging instrument, while the postconviction appellate argument faulted direct appellate counsel for omissions related to compulsory joinder and speedy-trial rights, which trial counsel had previously addressed. The petition and the postconviction appellate argument shared no underlying subject matter and identified different attorneys as having rendered ineffective assistance. Here, the petition and the postconviction appellate arguments both allege ineffectiveness of appellate counsel for omissions related to the underlying issue of the admissibility of N.H.'s confession." *Id*. ¶ 66.

The *Thomas* court also indicated the portion of *Mars* commenting on the quality of the petition "should not be viewed as holding a well-reasoned and articulate *pro se* petition to a higher

19

standard than one that is drafted less artfully." *Id*. ¶ 67. In addition, the *Thomas* court characterized *Jones* as merely affirming a summary dismissal where the postconviction petition asserted only that the petitioner was denied his sixth amendment right to effective assistance of counsel, without any supporting detail. See *id*. ¶¶ 73-74.

¶ 55    We agree with *Thomas* to the extent that decision suggests *Jones* does not entirely answer the forfeiture question in cases such as this one. Otherwise, there would have been no need for the extended discussion of forfeiture found in *Mars*, *Cole*, *Hemingway*, and *Thomas*. Our supreme court, however, has indicated that this court is not free to consider claims raised for the first time on appeal from the dismissal of a postconviction petition. *Pendleton*, 223 Ill. 2d at 475; *Jones*, 213 Ill. 2d at 505.

¶ 56    Furthermore, *Jones* instructed this court that a petition which merely asserts the petitioner received ineffective assistance of counsel does "not satisfy even the low threshold of presenting 'a modest amount of detail,' even without legal argument or citation to legal authority." *Thomas*, 2014 IL App (2d) 121001, ¶ 74 (quoting *Jones*, 213 Ill. 2d at 504). The *Thomas* court relied on the part of section 122-2 of the Act which provides that " '[a]rgument *** shall be omitted from the petition.' " *Id*. ¶ 77 (quoting 725 ILCS 5/122-2 (West 2012)). The *Thomas* court, however, acknowledged that portion of section 122-2 refers to "*legal* argument or citation to *legal* authority," rather than the factual allegations of the petition. (Emphases added.) *Id*. ¶ 74.

¶ 57    Regarding the factual allegations of the postconviction petition, section 122-2 of the Act requires that the petition must "*clearly* set forth the *respects* in which petitioner's constitutional rights were violated." (Emphases added.) 725 ILCS 5/122-2 (West 2010). Merely asserting that the petitioner received ineffective assistance of counsel does not meet this low threshold. *Jones*, 213 Ill. 2d at 504; *Thomas*, 2014 IL App (2d) 121001, ¶ 74. A postconviction petition need only

include limited detail to proceed beyond the first stage of postconviction review. *Hodges*, 234 Ill. 2d at 9. The allegations in the petition must be taken as true and liberally construed. See *Edwards*, 197 Ill. 2d at 244. Yet the allegations, limited in detail and liberally construed, must nevertheless *clearly* set forth *the respects* in which petitioner's constitutional rights were violated. *Thomas*, 2014 IL App (2d) 121001, ¶ 48; *Mars*, 2012 IL App (2d) 110695, ¶ 32.

¶ 58 This interpretation of section 122-2 of the Act is consistent with the remainder of the section, which requires that the petitioner either provide "affidavits, records, or other evidence" to support the petitioner's allegations or explain the absence of such documentation. 725 ILCS 5/122-2 (West 2010). The requirement that the petition clearly set forth the respects in which petitioner's constitutional rights were violated must be read in the context of the requirement of providing supporting material for the allegations or explanations for the absence of supporting materials. See, *e.g.*, *People v. Lloyd*, 2013 IL 113510, ¶ 25 ("[W]e may consider the statute's context, reading the provision at issue in light of the entire section in which it appears, and the Act of which that section is a part."). Reading section 122-2 as a whole, a postconviction petition is required to clearly set forth the respects in which the petitioner's constitutional rights were violated and provide evidence in support of those claims, but not legal argument. See 725 ILCS 5/122-2 (West 2010). With this understanding of the Act, we turn to consider whether Reed forfeited the claims raised on appeal.

¶ 59 In this case, Reed's petition alleged in pertinent part ineffective assistance of appellate counsel for failing to challenge the admissibility of his alleged oral statement on hearsay grounds. On appeal, Reed argues direct appellate counsel was ineffective by failing to challenge the admissibility of his statement on different, constitutional grounds. Although both claims nominally address Reed's statement to the police, the claim in the petition is that Reed's "alleged"

21

statement may not have been his statement at all (or not inculpatory), whereas the claim asserted on appeal is that Reed provided a statement, but the statement was illegally obtained, regardless of whether it was inculpatory. These arguments are not necessarily inconsistent, but they are distinct from each other.

¶ 60    Accordingly, this case is distinguishable from *Thomas*, in which the petition alleged appellate counsel should have argued trial counsel was ineffective for failing to take additional steps to ensure N.H.'s confession was admitted, and the argument on appeal addressed those additional steps. See *Thomas*, 2014 IL App (2d) 121001, ¶¶ 2-3. As the *Thomas* court observed:

> "Both in the petition and on appeal from the summary dismissal, defendant has
> (1) alleged ineffective assistance of appellate counsel, (2) addressed the same
> underlying subject matter, *i.e*. N.H.'s confessions to the detectives and to Chaplain
> Fricks, and (3) identified as error the ruling on Chaplain Fricks' testimony." *Id*. ¶
> 86.

In this case, both the petition and the appeal allege ineffective assistance of appellate counsel related to Reed's statement, but the respects in which Reed allegedly received ineffective assistance of appellate counsel are distinctly different.

¶ 61    Reed argues that we should nevertheless construe his claim that his *trial* counsel was ineffective by failing to file a pretrial motion to suppress his "alleged" oral statement as a claim that his direct *appellate* counsel was ineffective for failing to raise this claim of ineffective assistance of trial counsel. This argument is similar to the claim rejected in *Mars*. In that case, the appellate court affirmed the first-stage dismissal of a postconviction petition because that petition's reference to "defense counsel," read in context, referred to trial counsel and not to appellate counsel. *Mars*, 2012 IL App (2d) 110695, ¶ 33. In this case, Reed's petition clearly set

forth claims of ineffective assistance of trial counsel, distinct from the petition's claims of ineffective assistance of direct appellate counsel. To construe one of the former claims as one of the latter claims would require more than liberal construction.

¶ 62   Reed's petition further alleged ineffective assistance of appellate counsel based on the failure "to renew Post Trial Motion's [*sic*], motion for New Trial, motion for appointment of new counsel."   Reed asserted several claims of ineffective assistance of trial counsel in his *pro se* supplemental posttrial motion. Indeed, Reed also asserted claims other than ineffective assistance of appellate counsel in his posttrial motions. As previously noted, "nonfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require a hearing under the Act." *Rissley*, 206 Ill. 2d at 412 (citing *Coleman*, 183 Ill. 2d at 381). As Reed's *pro se* supplemental posttrial motion contained numerous claims, Reed's allegation regarding appellate counsel's failure to "renew" his posttrial motions is nonspecific and conclusional. Indeed, it is an allegation almost as broad as the claim, dismissed in *Hemingway*, that direct appellate counsel did not brief one issue regarding his conviction or sentence. *Hemingway*, 2014 IL App (4th) 121039, ¶ 30. The allegation regarding the posttrial motions fails to "clearly set forth the respects in which petitioner's constitutional rights were violated." 725 ILCS 5/122-2 (West 2010).

¶ 63   Similarly, Reed's petition contains no allegation that his appellate counsel was ineffective by failing to argue that the treatment of his general guilty verdict as a verdict of felony murder made him legally ineligible for a natural life sentence. Reed's *pro se* motion to reduce his sentence asserts his natural life sentence was invalid, but this motion is not mentioned in his petition. Construing Reed's reference to " Post Trial Motion's [*sic*], motion for New Trial, motion for appointment of new counsel" as applying to his postsentencing motion would again

23

require this court to recognize a nonspecific claim of ineffective assistance of appellate counsel that is not clearly set forth in the petition. In sum, Reed's petition does not clearly set forth the claims of ineffective assistance of trial counsel now raised on appeal, resulting in forfeiture of these claims on appeal.

¶ 64                                 Alternative Discussion of the Merits

¶ 65     Moreover, even if Reed had not forfeited these claims on appeal, the claims of ineffective assistance of appellate counsel would not have prevailed.[3] As previously noted, the trial court denied Reed's *pro se* posttrial motions in part because Reed failed to support his allegations regarding expected testimony from ASA Chung. In dismissing Reed's postconviction petition, the trial court similarly noted Reed's failure to support his assertions regarding the anticipated testimony from ASA Chung (among others). A review of Reed's petition established that Reed also failed to explain why he did not attach an affidavit from ASA Chung. Accordingly, the trial judge did not err in summarily dismissing this claim. 725 ILCS 5/122-2 (West 2010); *Delton*, 227 Ill. 2d at 255.[4]

¶ 66     Regarding the claim that appellate counsel failed to argue Reed's natural life sentence was invalid pursuant to *Smith* and *Bailey*, the effectiveness of Reed's counsel must be assessed against an objective standard of reasonableness from the perspective of the time of the alleged

---

[3] Although our supreme court has reminded this court to address forfeiture of postconviction claims rather than decide such claims on the merits (*Supra* ¶ 38), in this case we have considered and disposed of Reed's claims as forfeited, and discuss the merits solely in the alternative.

[4] The correspondence from OSAD also indicated that appellate counsel researched issues related to trial counsel's failure to file a motion to suppress.

error and without hindsight. *People v. Teague*, 228 Ill. App. 3d 855, 859 (1992) (citing *Strickland v. Washington*, 466 U.S. 668, 689 (1984)). "Appellate counsel's assessment of the merits of an issue *** depends on the state of the law at the time of the direct appeal." *People v. English*, 2013 IL 112890, ¶ 34 (citing *People v. Weninger*, 292 Ill. App. 3d 340, 345 (1997)). Appellate counsel is not incompetent for failing to accurately predict that existing law will change. See *id*. The objective standard of reasonableness "is not met where counsel fails to assert an argument formulated after the fact with the aid of a new legal rule." *Teague*, 228 Ill. App. 3d at 859 (citing *Smith v. Murray*, 477 U.S. 527, 535-36 (1986)); see also *People v. King*, 192 Ill. 2d 189, 197 (2000) (rejecting argument that counsel may be ineffective for failing to anticipate United States Supreme Court decision); *People v. Knippenberg*, 325 Ill. App. 3d 251, 261 (2001) (same); *People v. Maury*, 287 Ill. App. 3d 77, 84 (1997) (claim that counsel was ineffective by not divining a later change in the law is "absurd"). "Indeed, to require counsel to 'preminisce' future *** court holdings would render 'effective assistance' an impossible standard to meet ***." *People v. Chatman*, 357 Ill. App. 3d 695, 700 (2005).

¶ 67    In this case, appellate counsel successfully argued the trial court erred in denying the jury instructions for intentional, knowing and felony murder, pursuant to *Smith*. *Reed*, 405 Ill. App. 3d at 286. As *Smith* was already decided before the decision in Reed's direct appeal, it was obviously not a new legal rule. Thus, the issue is whether our supreme court's decision in *Bailey* constitutes a new legal rule.

¶ 68    Our decision in *Teague* did not include a detailed consideration of what constitutes a new legal rule, but the United States Supreme Court's prior decision regarding Teague, which discussed the issue of what constitutes a new rule for the purposes of determining whether a constitutional rule of criminal procedure applies retroactively on collateral review, offers

guidance on the question.  See *Teague v. Lane*, 489 U.S. 288 (1989).  "[A] case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." (Emphasis omitted.)  *Id*. at 301 (plurality op.)  Conversely, *Teague* also established that a case does *not* "announce a new rule [when] it '[is] merely an application of the principle that governed' " a prior decision to a different set of facts.  *Id*. at 307 (quoting *Yates v. Aiken*, 484 U.S. 211, 216-17 (1988)).  When all a court does is apply a general standard to the kind of factual circumstances it was meant to address, that decision will rarely state a new rule for *Teague* purposes.  *Chaidez v. United States*, ___ U.S. ___, ___, 133 S. Ct. 1103, 1107 (2013).  These basic principles may be easily adapted, with minor modifications as necessary, to a determination of whether appellate counsel in this case should have presented the argument ultimately accepted by our supreme court in *Bailey*.  That determination requires a closer examination of the decisions in *Smith* and *Bailey*.

¶ 69     In *Smith*, our supreme court considered whether a trial court must provide the jury with separate verdict forms when a defendant is charged with multiple counts of murder based on differing mental states and the defendant requests such forms.  *Smith*, 233 Ill. 2d at 4-5.  In consolidated cases, the defendants were each charged with intentional murder, knowing murder, and felony murder, along with the underlying felony offenses predicating the felony murder charges.  *Id*. at 5.  Both defendants requested separate verdict forms for felony murder, which both trial courts denied.  *Id*.  In both cases, the juries returned general verdicts of guilty of first degree murder; the juries also found the defendants guilty of the underlying felony offenses.  *Id*.

¶ 70     The trial court in the first case sentenced the defendant to 60 years' imprisonment for the first degree murder conviction, a concurrent term of 20 years for armed robbery, and a consecutive term of 8 years for attempted armed robbery.  *Id*. at 9.  On appeal, the first defendant

argued that, had the jury been provided a separate instruction on felony murder, he might not have been eligible to be sentenced to a consecutive sentence on the attempted armed robbery conviction. *Id*. The appellate court agreed and modified the defendant's sentence, making the eight-year term concurrent. *Id*. at 10. In the second case, the trial court sentenced that defendant to 38 years' imprisonment for the murder and 18 years' imprisonment for the armed robbery, to run consecutively. *Id*. at 13. The appellate court affirmed the second defendant's convictions, but (as with the first defendant) modified his consecutive sentence for armed robbery to run concurrently with his sentence for murder. *Id*.

¶ 71    On appeal, the *Smith* court acknowledged:

"[T]here may be different sentencing consequences based on the specific theory of murder proven. For example, there are several aggravating factors, applicable only to murders committed intentionally or knowingly, which, if proven to exist, will support a sentence of death. See 720 ILCS 5/9-1(b) (West 2006). However, a person convicted of felony murder is eligible for the death penalty only if the sentencing jury finds beyond a reasonable doubt that the requirements of section 9-1(b)(6) have been proven, *i.e.*, that the defendant actually killed the victim or substantially contributed to his physical injuries and, in so doing, intended to kill or knew that his acts caused a strong probability of death or great bodily harm. 720 ILCS 5/9-1(b)(6) (West 2006); *People v. Fuller*, 205 Ill. 2d 308 (2002) (death penalty vacated where sentencing jury was never instructed regarding the necessary (section 9-1(b)(6)) mental state requirements and a general finding of eligibility was returned); see also *People v. Mack*, 167 Ill. 2d 525, 538 (1995) (death penalty vacated where verdict form attempted to set forth the (section 9-

27

1(b)(6)) statutory aggravating factor, but failed to do so completely and omitted an essential element)." *Smith*, 233 Ill. 2d at 17.

Moreover, the predicate felony underlying a charge of felony murder is a lesser included offense of felony murder; thus, a defendant convicted of felony murder may not be convicted on the underlying felony. *Id*. In such instances, the predicate offense will not support a separate conviction or sentence. See *id*.

¶ 72 The *Smith* court also recognized the long-standing legal construct known as the "one good count rule," which provides that if one count in an indictment is valid, although all the others were defective, it was sufficient to support a general verdict of guilty. See *id*. at 18-19. As a corollary to the "one good count rule," Illinois courts have also consistently held that, in a case where an indictment contains several counts arising out of a single transaction, a general verdict will have the effect of the defendant being guilty of each charged count except in cases where the one-act, one-crime doctrine applied and a sentence is imposed only on the most serious offense. *Id*. at 20. Moreover, in cases where a defendant is charged with murder in multiple counts alleging intentional, knowing and felony murder, and a general verdict is returned, the defendant is presumed to be guilty of the most serious offense, and a sentence is to be imposed on that offense. *Id*. at 21.

¶ 73 The *Smith* defendants did not challenge these general legal principles, but they challenged the presumptions of these principles when they would prejudice the defendant by subjecting him to more severe punishment. *Id*. Our supreme court agreed, stating that it was impossible to determine from a general verdict form the basis on which the jury found the defendant guilty of first degree murder. *Id*. at 23. The court agreed with the defendants' contentions that it was a violation of due process to deny them the opportunity to have the juries

decide their theory of defense (which was that at most, the defendants were guilty of the less culpable offense of felony murder), then sentence them on the presumption that they were convicted of the more serious offense. *Id*. The *Smith* court held that where "specific findings by the jury with regard to the offenses charged could result in different sentencing consequences, favorable to the defendant, specific verdict forms must be provided upon request and the failure to provide them is an abuse of discretion." *Id*. In addition, in cases where the court cannot conclude that the general verdicts establish the juries found the defendants guilty of each of the theories of murder charged, it is error to sentence the defendants on the presumption that they were found guilty of intentional murder. See *id*. at 27. *Smith* held that in such cases, the appropriate remedy is to interpret the general verdict as a finding on felony murder. *Id*. at 28. As a result, the defendants' convictions and sentences for murder were affirmed, but the convictions and sentences for the predicate felonies were vacated, and the cases remanded for correction of the mittimus in each case. *Id*. at 29.

¶ 74 In *Bailey*, the defendant was charged with intentional, knowing, and felony murder, and with the predicate crimes of home invasion and robbery of an individual 60 years of age or older. *People v. Bailey*, 2013 IL 113690, ¶ 1. "After the State announced its intent to seek the death penalty, defendant elected to have the trial court determine his eligibility for the death sentence." *Id*. The trial court denied a defense request for separate verdict forms on the two counts of felony murder. *Id*. The jury found Bailey guilty of first degree murder, home invasion, and robbery. The trial court found Bailey eligible for the death penalty, but sentenced him instead to concurrent terms of natural life, 30 years, and 15 years, respectively. *Id*. On appeal, "[t]he appellate court found that the circuit court erred by refusing defendant's request for separate felony-murder verdict forms, but that he was properly sentenced to a term of natural life without

the possibility of parole." *Id*. (citing *People v. Bailey*, 2011 IL App (1st) 090074-U). Our supreme court accepted his appeal.

¶ 75    Initially, our supreme court acknowledged the link between the verdict forms and sentencing was not as clear-cut as in *Smith*. *Bailey*, 2013 IL 113690, ¶ 21. The court explained:

"Defendant's argument is that if the jury had been asked to render specific verdicts rather than a general verdict, it might have convicted him of felony murder only and acquitted him of intentional or knowing murder. Had he been acquitted by the jury of intentional or knowing murder, the defendant could not have been found eligible for the death penalty under section 9-1(b)(6) [of the Criminal Code of 1961], which requires a finding that the defendant either intended to kill the victim or knew that his acts caused a strong probability of death or great bodily harm. 720 ILCS 5/9-1(b)(6) (West 2006). That is, felony murder serves as an eligibility factor only if the murder was committed with intent or knowledge. As a result, use of specific verdict forms could have precluded the application of section 9-1(b)(6). Finally, defendant argues that if he had not been found eligible for the death penalty, he could not have been sentenced to a term of natural life. 730 ILCS 5/5-8-1(a)(1)(b) (West 2006). The proper sentence would have been a term of 20 to 60 years. 730 ILCS 5/5-8-1(a)(1)(a) (West 2006)." *Bailey*, 2013 IL 113690, ¶ 21.

Our supreme court declared it "anticipated" such a situation in *Smith*. *Id*. ¶ 22 (citing *Smith*, 233 Ill. 2d at 17). The court acknowledged, however, that Bailey's appeal presented "the added circumstance that the defendant elected to have the trial court, rather than the jury, determine his eligibility for the death penalty." *Id*. ¶ 23.

¶ 76    Accordingly, one of the questions the *Bailey* court was required to address was whether *Smith* was applicable when the trial court, not the jury, makes the finding of intent or knowledge. *Id*. ¶ 24. The State argued *Smith* was inapplicable, contending the defendant's waiver of a jury for the eligibility phase made the trial court the independent finder of fact, and the trial court's consideration of defendant's mental state was thus not limited by the jury's verdict. *Bailey*, 2013 IL 113690, ¶ 44. Bailey argued that if the jury had been given separate verdict forms as he requested and if the jury had found him not guilty of intentional and knowing murder, the trial court not have made a finding of intent or knowledge under section 9-1(b)(6) of the Criminal Code of 1961. *Id*. ¶ 45. Bailey relied upon *Beck v. Alabama*, 447 U.S. 625 (1980), and *Bullington v. Missouri*, 451 U.S. 430 (1981), in support of his position. *Bailey*, 2013 IL 113690, ¶ 45.

¶ 77    In *Beck*, the United States Supreme Court held, as a matter of due process, Alabama was constitutionally prohibited from withdrawing from the jury the option of finding the defendant guilty of a lesser included offense in a capital case, if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction. See *Beck*, 447 U.S. at 637-38. Our supreme court stated that *Beck* did not dictate the result in Bailey's appeal because: (1) in Illinois, felony murder is not a lesser included offense of first degree murder; and (2) *Beck* does not require a separate jury instruction or verdict form upon request by a defendant. *Bailey*, 2013 IL 113690, ¶¶ 48-49. The *Bailey* court, however, determined that *Beck* was not "irrelevant" to its analysis. *Id*. ¶ 50. The court ultimately found *Beck* "instructive" and "persuasive that a defendant's request for separate instructions and verdict forms on felony murder should be provided when their presence could affect the defendant's eligibility for the death penalty and for a life sentence if death is not imposed." *Id*. ¶ 51.

¶ 78    In *Bullington*, the United States Supreme Court held on double jeopardy grounds that Missouri could not seek the death penalty in a retrial after the jury in the first trial rejected the death penalty, reasoning the sentence of life imprisonment defendant received at his first trial meant the jury had already acquitted the defendant of whatever was necessary to impose the death sentence.  See *Bullington*, 451 U.S. at 444-45.  The *Bailey* court observed that, like *Beck*, *Bullington* did not directly address the question in Bailey's appeal, which had a different procedural posture.  See *Bailey*, 2013 IL 113690, ¶ 54.  The court, however, acknowledged that *Bullington* stood "for the proposition that once a jury has acquitted a defendant of an offense, an element of which is necessary to the imposition of the death penalty, a subsequent fact finder— whether judge or jury—may not make a contradictory finding."  *Id*.

¶ 79    The *Bailey* court reasoned that *Beck*, *Bullington*, and *Smith*, taken together, "suggest that if a jury in a capital case has rendered a verdict in the guilt phase that contradicts a fact necessary for a finding of eligibility at the sentencing phase, a contradictory finding cannot be made."  *Id*. ¶ 55.  Accordingly, in Bailey's appeal, "if the jury had been given separate verdict forms and had acquitted defendant of intentional or knowing murder, application of section 9-1(b)(6) would have been foreclosed because the verdict would have negated an essential element of this eligibility factor."  *Id*. ¶ 56.  The court thus rejected the State's argument that the factual determinations made during the guilt phase and the eligibility phase are " 'mutually exclusive,' " finding it inconsistent with "Supreme Court precedent."  *Id*.

¶ 80    Furthermore, the *Bailey* court concluded that because the verdict must be interpreted not only as a conviction of felony murder, but also as an acquittal of intentional or knowing murder, the trial court's finding of eligibility for the death sentence could not stand, and Bailey's natural life sentence predicated on that eligibility could not stand.  *Id*. ¶¶ 64-65.  The *Bailey* court

observed that its decision did not repudiate the "one good count rule," which remained applicable where a general verdict of guilty was properly rendered. *Id*. ¶ 69. The court noted that the rule in *Smith* (and by implication, the remedy in *Bailey*) "applies only where the defendant has requested separate verdict forms, where the lack of separate verdict forms could have adverse sentencing consequences, and where the trial court denies the defendant's request." *Id*. Thus, our supreme court held it was error to deny defendant's request for separate verdict forms and the proper remedy for this error was to vacate the defendant's sentence of life imprisonment and to remand to the trial court for resentencing. *Id*. ¶ 71.

¶ 81     In this case, Reed argues he received ineffective assistance of appellate counsel where counsel relied on *Smith* to obtain relief but failed to present the argument accepted years later in *Bailey*. The preceding discussion of *Bailey*, however, demonstrates that *Bailey* established a new rule and was not merely an application of the principle established in *Smith*. The *Bailey* court, while stating it anticipated certain sentencing consequences in *Smith*, was faced with the additional circumstance of the sentencing by the trial judge. The *Bailey* court was thus required to address whether *Smith* was *applicable* in the first instance to that circumstance. *Id*. ¶ 24. In addition, the *Bailey* court's extensive analysis was not focused only on *Smith*. Rather, the court also considered *Beck* and *Bullington*, finding neither dictated the result in Bailey's appeal. *Id*. ¶¶ 48, 54. It was only when principles our supreme court gleaned from *Beck* and *Bullington* were taken together with the court's prior decision in *Smith* that the *Bailey* court concluded *Smith* was not only applicable, but also required that Bailey's natural life sentence be vacated. Thus, *Bailey* broke new ground and established a rule not dictated by precedent existing at the time of Reed's direct appeal. See *Teague*, 489 U.S. at 301 (plurality op.). Accordingly, Reed cannot establish appellate counsel was ineffective for failing to assert an argument formulated after the

fact with the aid of a new legal rule. *Teague*, 228 Ill. App. 3d at 859.

¶ 82    In sum, the circuit court did not err in summarily dismissing Reed's postconviction petition because the arguments Reed attempts to raise for the first time on appeal are forfeited. Moreover, even if Reed's arguments had not been forfeited, they would be properly dismissed as lacking an arguable basis either in law or in fact.

¶ 83                                    Voidness

¶ 84    Reed also argues that his natural life sentence is void. Our supreme court has held that a sentence which does not conform to a statutory requirement is void, and a void order may be attacked at any time or in any court, either directly or collaterally. *People v. Thompson*, 209 Ill. 2d 19, 24-25 (2004). Whether a sentence, or portion thereof, is void is a question of law subject to *de novo* review. *People v. Donelson*, 2011 IL App (1st) 092594, ¶ 7.

¶ 85    Reed, however, does not identify any respect in which the trial court lacked the statutory authority to impose a natural life sentence. Indeed, the trial court found Reed eligible for the death penalty by statute, based on the fact that during the course of another forcible felony, defendant inflicted injuries which at least in part contributed to the victim's death, and defendant acted with the knowledge that his acts created a strong probability of death or great bodily harm. See *Reed*, 405 Ill. App. 3d at 287 (citing 720 ILCS 5/9-1(b)(6) (West 2006)). Rather, Reed contends that his sentence was unauthorized (and thus void) under our supreme court's decision in *Bailey*, *i.e.*, the trial court's failure to instruct the jury on the various theories of murder in this case foreclosed the trial court from making its own determination of a defendant's mental state and barred the prosecution from seeking a finding of eligibility under section 9-1(b)(6). See *Bailey*, 2013 IL 113690, ¶ 64.

¶ 86    We have previously concluded that *Bailey* established a "new" rule of law. "A judicial

decision that establishes a new constitutional rule applies to all criminal cases pending on direct review." *People v. Davis*, 2014 IL 115595, ¶ 36 (citing *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004)). [5] As to convictions that are already final, however, a new rule does not apply retroactively to cases on collateral review except in two instances. First, " '[n]ew *substantive* rules generally apply retroactively.' " (Emphasis in original.) *Davis*, 2014 IL 115595, ¶ 36 (quoting *Schriro*, 542 U.S. at 351). Substantive rules include those that narrow the scope of a criminal statute by interpreting its terms, and constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish. *Davis*, 2014 IL 115595, ¶ 36 (citing *Schriro*, 542 U.S. at 351-52). "Such rules apply retroactively because they 'necessarily carry a significant risk that a defendant stands convicted of "an act that the law does not make criminal" ' or faces a punishment that the law cannot impose upon him." (Internal quotation marks omitted.) *Davis*, 2014 IL 115595, ¶ 36 (quoting *Schriro*, 542 U.S. at 352).

¶ 87 Second, new rules of procedure generally do not apply retroactively, because " '[t]hey do not produce a class of persons convicted of conduct the law does not make criminal.' " *Davis*, 2014 IL 115595, ¶ 36 (quoting *Schriro*, 542 U.S. at 352). Rather, new procedural rules " 'merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise.' " *Davis*, 2014 IL 115595, ¶ 36 (quoting *Schriro*, 542 U.S. at 352). Accordingly, courts " 'give retroactive effect to only a small set of watershed rules of criminal

---

[5] Reed does not assert or argue that the decision is *Bailey* is not a *constitutional* rule. *Bailey* is based in part upon *Smith*, which is based on due process concerns. See *Smith*, 233 Ill. 2d at 23. As previously noted, the decision in *Bailey* is also based upon *Beck* and *Bullington*, decisions finding violations of due process and double jeopardy, respectively. *Supra* ¶¶ 71-73. Accordingly, the rule established in *Bailey* is a new constitutional rule.

procedure implicating the fundamental fairness and accuracy of the criminal proceeding.' " *Davis*, 2014 IL 115595, ¶ 36 (quoting *Schriro*, 542 U.S. at 352). A sentencing issue, which has no involvement in the accuracy of the conviction, is thus outside of this second exception. See *People v. Morris*, 236 Ill. 2d 345, 363 (2010).

¶ 88    In this case, Reed does not argue either of these exceptions is applicable. Instead, Reed maintains *Bailey* did not establish a new rule—a contention we have already rejected. Nevertheless, we will briefly explain why neither exception applies in this case.

¶ 89    Regarding the first exception, "[a] rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes." *Schriro*, 542 U.S. at 353. For example, in *Davis*, 2014 IL 115595, ¶¶ 33-43, our supreme court considered whether *Miller v. Alabama*, 567 U.S. ____, 132 S. Ct. 2455 (2012), retroactively applied to cases on collateral review. *Miller* holds that a mandatory life-without-parole sentence for a juvenile violates the eighth amendment prohibition against cruel and unusual punishment. *Miller*, 567 U.S. at ____, 132 S. Ct. at 2475. In *Davis*, our supreme court concluded that while *Miller* mandates a new procedure for sentencing minors based on their individual circumstances, that new procedure is the result of the substantive prohibition of mandatory life-without-parole sentences for minors. *Davis*, 2014 IL 115595, ¶ 39. "In other words, *Miller* places a particular class of persons covered by the statute—juveniles—constitutionally beyond the State's power to punish with a particular category of punishment—mandatory sentences of natural life without parole." (Emphasis omitted.) *Id*. Accordingly, our supreme court concluded *Miller* established a new substantive rule with applies retroactively on collateral review. *Id*.

¶ 90    In contrast, in *Schriro*, the United States Supreme Court considered whether *Ring v. Arizona*, 536 U.S. 584 (2002), applies retroactively. *Ring* held that *Apprendi v. New Jersey*, 530

U.S. 466 (2000), did not permit a judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty. *Ring*, 536 U.S. at 609. The *Ring* Court reasoned that the aggravating factors in that case operated as the functional equivalent of an element of a greater offense. *Id*. The *Schriro* Court held *Ring*'s jury requirement is not a substantive rule because it does not affect the range of conduct that may be criminalized by the State. *Schriro*, 542 U.S. at 353. Instead, *Ring* only affects whether a jury or a judge decides whether the defendant's conduct was punishable by death. *Id*.; see also *Lucien v. Briley*, 213 Ill. 2d 340, 348 (2004) (discussing *Schriro*).

¶ 91     In this case, our supreme court's decision in *Bailey* does not alter the range of conduct or the class of persons that the law punishes. Pursuant to *Bailey*, any defendant convicted of murder is subject to the sentences authorized by statute, so long as the defendant's jury was properly instructed. Analogous to *Ring*, the defendant's mental state would operate not only as an element of the more serious theories of murder, but also as a factor making a defendant found guilty of felony murder eligible for the death penalty. *Bailey* merely permits a defendant to request that the jury, rather than the sentencing judge, determine whether the State proved a mental state necessary for the defendant to be eligible for the death penalty. See *Bailey*, 2013 IL 113690, ¶¶ 64, 69. *Bailey* thus allocates decision-making authority between the jury and the judge and is therefore considered a procedural rule, not a substantive rule. See *Schriro*, 542 U.S. at 353.

¶ 92     Regarding the second exception, as previously noted, a sentencing issue does not fall within this exception because it has no involvement in the accuracy of the conviction. See *Morris*, 236 Ill. 2d at 363. Accordingly, we conclude *Bailey* does not apply retroactively on

collateral review. Thus, Reed's voidness argument fails.[6]

¶ 93                                    CONCLUSION

¶ 94    In sum, the issues Reed's counsel attempted to raise on appeal are forfeited because Reed failed to raise them in his postconviction petition. Even if Reed's claims were not forfeited, they are frivolous and patently without merit, because Reed failed to attach supporting material and appellate counsel was not required to anticipate *Bailey*, which was decided after Reed's direct appeals had concluded. In addition, Reed's natural life sentence is not void because our supreme court's decision in *Bailey* announced a new rule of constitutional procedure that does not apply retroactively to these postconviction proceedings. For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 95    Affirmed.

---

[6] Given this conclusion, we need not address the State's argument that even if *Bailey* applied to Reed's postconviction proceedings, the sentence was not void because the jury in this case found the armed robbery was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty and the sentencing judge found the victim's death "was brutal and heinous beyond the most person's [*sic*] capacity to understand probably or even imagine."